Liza M. Walsh
Katelyn O'Reilly
Jessica K. Formichella
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
(973) 757-1100

*Attorneys for Plaintiff Esperion Therapeutics, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE NEXLETOL/NEXLIZET ANDA LITIGATION** | Civil Action No. 2:24-cv-05921 <br><br> (JXN-CF) (Consolidated) |

## PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................1

II.   BACKGROUND ........................................................................5

      A.    The Development of Bempedoic Acid for Pharmaceutical Use ...........5

      B.    The Asserted Patents and Representative Claims .................................7

III.  RELEVANT LEGAL PRINCIPLES ...........................................10

IV.   LEVEL OF SKILL IN THE ART ..................................................11

V.    CONSTRUCTION OF DISPUTED PATENT TERMS ...............................12

      A.    The Plain Meaning of "Pharmaceutical Material" in the
            Asserted Patents Is "a Substance Suitable for Use as an Active
            Pharmaceutical Ingredient." ........................................................13

      B.    There is No Basis for Importing Process Limitations into the
            Claim Term ..................................................................................17

            1.    The claims do not contain process steps. ..................................18

            2.    Importing process limitations into claims is highly
                  disfavored and unjustified here .................................................21

VI.   CONCLUSION ............................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007) ............................................................24

*Continental Circuits LLC v. Intel Corp*.,
    915 F.3d 788 (Fed. Cir. 2019) ........................................5, 6, 13, 24

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
    381 F.3d 1352 (Fed. Cir. 2004) ...........................................................7

*Incyte Corp. v. Sun Pharm. Indus. Ltd.*,
    No. 24-6944, D.I. 135 (D.N.J. Nov. 1, 2024) (Neals, J.) ..................21

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)............................................................................12

*Mass. Inst. Of Tech. v. Shire Pharms., Inc.*,
    839 F.3d 1111 (Fed. Cir. 2016) .........................................................27

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) .........................................................23

*Merck Sharp & Dohme Corp., v. Xellia Pharmaceuticals Aps*,
    No. 14–199, 2015 WL 82386 (D. Del. Jan. 6, 2015) ........................26

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) .........................................................22

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .............................................5, 12, 13

*Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*,
    345 F. App'x 594 (Fed. Cir. 2009)................................................24, 27

*Sorrell Holdings, LLC v. Infinity Headwear & Apparel, LLC*,
    No. 2022-1964, 2024 WL 413432 (Fed. Cir. 2024)............................6

*Thorner v. Sony Comput. Ent't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ....................................................................13, 20

*Vanguard Products Corp. v. Parker Hannifin Corp.*,
    234 F.3d 1370 (Fed. Cir. 2000) ............................................................................24

*Vectura Ltd. v. GlaxoSmithKline LLC*,
    981 F.3d 1030 (Fed. Cir. 2020) ............................................................................26

*Vifor (Int'l) AG v. Mylan Laby's Ltd.*,
    No. 19-13955, 2021 WL 2652123 (D.N.J. Jun. 28, 2021) ..................................21

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................................12, 20

## I.     INTRODUCTION

This case involves Esperion Therapeutics, Inc.'s ("Esperion") patented discovery of bempedoic acid, an active pharmaceutical ingredient in its lifesaving products, NEXLETOL® and NEXLIZET®.  In particular, these bempedoic acid-based treatments are critical for patients at high risk of life-threatening cardiovascular events, such as heart attack and stroke, or with a severe form of cholesterol disorder known as familial hypercholesterolemia, who are unable to manage their conditions with the more commonly prescribed statin anti-cholesterol medications.  For these patients, statins cause unwanted side effects, such as muscle and liver damage, and patients are often forced to reduce or discontinue treatment, despite their ongoing need to control their cholesterol.  The launch of NEXLETOL® and NEXLIZET® provided statin-intolerant patients with an effective option for lowering cholesterol and reducing the risk of cardiovascular events without long-term damage to their muscles and liver.  Esperion's bempedoic acid was the first oral, non-statin cholesterol drug approved by FDA in nearly two decades. Defendants have filed Abbreviated New Drug Applications ("ANDAs") seeking FDA approval for generic versions of NEXLETOL® and NEXLIZET® prior to the expiration of Esperion's patents.

At issue for the Court at the present time is the meaning of two words commonly used in the field of therapeutic drug development: "pharmaceutical

material."  Here, the words appear in five of Esperion's asserted patents that concern newly discovered forms of bempedoic acid.  Esperion proposes that the words have their ordinary meaning in light of a problem and solution identified in the specification: Bempedoic acid was a compound believed to have beneficial therapeutic properties, but there was a need to find forms of the compound with the right purity, stability, and manufacturability for use in a commercial drug product to treat patients.  The inventors solved that problem when they discovered "***highly pure, stable forms of bempedoic acid suitable for use as an active pharmaceutical ingredient***."  Ex. 1[1] ('714 Patent[2]) at 1:31-34.  As the intrinsic evidence in the patents at issue makes clear, the claimed "pharmaceutical material" is therefore a "substance suitable for use as an active pharmaceutical ingredient."

Defendants, on the other hand, seek to limit "pharmaceutical material" to the product of a detailed six-step process that is not found in the asserted claims, effectively transforming the composition claims into product-by-process claims with hidden process steps.  Defendants cannot contend that the process in their proposed construction is contained in the ordinary meaning of the words "pharmaceutical" or

---

[1] References to exhibits herein refer to exhibits attached to the Declaration of Liza M. Walsh in Support of Plaintiff's Opening Claim Construction Brief.

[2] The '511 Patent (Ex. 3), '714 Patent (Ex. 1), '584 Patent (Ex. 4), '087 Patent (Ex. 5), and '227 Patent (Ex. 6) share a specification.  Esperion will cite to the representative portion of the '714 patent specification throughout unless otherwise specified.

"material"; instead, Defendants try to import process elements from different portions of the specification where the inventors describe "various embodiments" of a different "aspect" of their invention.  Ex. 1 ('714 Patent) at 1:35-36, 1:55-2:34, 3:18-22.  But Defendants' argument must fail.  It is a "bedrock principle of patent law that the claims of a patent define the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  A party seeking to import limitations into the claims from the specification must meet "the 'exacting' standard required to limit the scope of the claims" to a single embodiment in the specification.  *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019).  Defendants do not come close to meeting that exacting standard here.

The process steps in Defendants' proposed construction are selected from portions of the specification describing "embodiments" of just "one aspect" of the invention that is separate from the aspects of the invention pertaining to "pharmaceutical materials." *Compare, e.g.*, Ex. 1 ('714 Patent) at 1:35-36 ("[i]n *one aspect*, the invention provides methods of preparing a compound") (emphasis added) *and id.* 1:55-56 ("[i]n various embodiments of the invention, the method generally comprises") *with id.* 3:40-43 ("[i]n *another aspect*, the invention provides high purity or purified bempedoic acid… [f]or example, described herein are pharmaceutical materials") (emphasis added).  Indeed, the process steps Defendants seek to import here are expressly claimed in separate Esperion patents that are not

3

asserted in this case. *See infra* Section V.B.1. Because those processes are alternative aspects of the inventors' discoveries, the specification refers to them using the type of optional language courts have consistently declined to treat as disclaimers of claim scope. *See, e.g., Continental Circuits*, 915 F.3d at 797-98; *Sorrell Holdings, LLC v. Infinity Headwear & Apparel, LLC*, No. 2022-1964, 2024 WL 413432, at *2-3 (Fed. Cir. 2024) (overturning claim construction that imported limitations described in the specification with respect to specific embodiments). What's more, the specification itself states unequivocally that "[n]o language in the specification should be construed as indicating any non-claimed element as essential to the practice of the present invention." Ex. 1 ('714 Patent) at 6:49-51.

The prosecution history likewise does not justify rewriting the claims as Defendants propose. Defendants contend that Esperion limited the term "pharmaceutical material" to a specific process during the prosecution of the patents. But nowhere in the prosecution history did Esperion make any such disavowal of claim scope or limit the term "pharmaceutical material" to a specific process, let alone the detailed process that Defendants propose to add to the claims. Defendants' argument comes down to a single statement made during the prosecution of one of the asserted patents that refers to a so-called "fingerprint impurity." But the term "pharmaceutical material" was not even used or discussed in that statement. And the mere reference to a so-called "fingerprint impurity" as "*indicative*" of a synthetic

4

process does not disclaim materials made by other processes that otherwise satisfy the express claim language. Ex. 2 ('714 Patent File History, Apr. 12, 2023 Applicant Remarks) at 6-7 (emphasis added). Defendants simply cannot meet the high standard set forth by the Federal Circuit for a clear and unmistakable disclaimer of claim scope. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").

The Court should reject Defendants' proposal and adopt Plaintiff's plain and ordinary construction of "pharmaceutical material."

## II.    BACKGROUND

### A.    The Development of Bempedoic Acid for Pharmaceutical Use

The Asserted Patents at issue in this dispute, U.S. Patent Number 11,613,511 ("the '511 Patent"), U.S. Patent Number 11,760,714 ("the '714 Patent"), U.S. Patent Number 11,926,584 ("the '584 Patent"), U.S. Patent Number 12,398,087 ("the '087 Patent"), and U.S. Patent Number 12,404,227 ("the '227 Patent"), relate to novel forms of bempedoic acid, a chemical compound that Esperion developed into treatments for lipid disorders and cardiovascular disease. *See* Ex. 1 ('714 Patent) at 1:19-23. Esperion spent nearly two decades working on developing bempedoic acid into an FDA-approved product.

5

At the time of the claimed inventions, it was known that bempedoic acid had potential therapeutic uses, but the compound had yet to be developed in a form that could be manufactured efficiently at commercial scale with the right stability, purity, and impurity profile to be approved for use in "commercializable drug product[s]." Ex. 1 ('714 Patent) at 1:16-35.   Commercial drug products combine active pharmaceutical ingredients with inactive ingredients, called excipients, in pharmaceutical formulations for administration to patients.  These ingredients must be manufacturable at scale, and as part of verifying the safety and efficacy of new drug products, regulatory agencies, like the U.S. Food and Drug Administration, require sponsors of new drug products to establish that the ingredients, particularly active ingredients, are highly pure and stable during their shelf-life, and that all impurities are adequately controlled.  Without the development of pure and stable pharmaceutical forms that can be efficiently manufactured at a commercial scale, promising chemical compounds cannot come to market.

While Esperion had discovered bempedoic acid by the early 2000s, the company continued to research and develop the compound for over fifteen years before discovering its clinical benefits for patients suffering from severe cholesterol disorders and cardiovascular disease, and before discovering a form suitable for commercial pharmaceutical use.  For example, Esperion found that laboratory-scale methods previously used to purify bempedoic acid, like column chromatography and

6

serial recrystallizations, were not feasible for commercial-scale manufacturing because they resulted in a significant loss of yield. Ex. 13 (Copp Decl.) at ¶ 13. The inventors of the patents-in-suit thus investigated and discovered "pure, stable forms of bempedoic acid suitable for use as an active pharmaceutical ingredient", as well as various methods for synthesizing and purifying bempedoic acid that would work efficiently at a commercial scale. Ex. 1 ('714 Patent) at 1:31-34.

### B.    The Asserted Patents and Representative Claims

In 2019, Esperion filed a provisional patent application describing the newly discovered pharmaceutical material and exemplary processes for making it, from which Esperion later prosecuted and obtained numerous patents covering various aspects of their inventions.

Five of the resulting patents are the Asserted Patents at issue here. The claims of these patents are directed to (1) a "pharmaceutical material" with specific recited properties that render it suitable for use as an active pharmaceutical ingredient (*see, e.g.*, Ex. 3 ('511 Patent), claim 1; Ex. 5 ('087 Patent), claim 1; Ex. 6 ('227 Patent), claim 1); (2)  a "pharmaceutical formulation" that contains the "pharmaceutical material" (*see, e.g.*, Ex. 1 ('714 Patent) claim 1; Ex. 5 ('087 Patent), claim 11); and (3) "a method" of lowering cholesterol by administering the "pharmaceutical material" (*see, e.g.*, Ex. 4 ('584 Patent), claim 1).  In each of these claims, the "pharmaceutical material" has the following properties: (i) a stable "crystalline

7

form" of bempedoic acid (i.e., the "compound of formula (V)"); (ii) a level of purity within a specified range; and (3) a controlled amount of a specified "diol" impurity (*i.e.*, "the compound of formula (VI)") and/or a specified "acetate impurity (*i.e.*, "the compound of formula (VIII)").

Claim 1 of the '511 Patent, which is illustrative, is reproduced below:

1.  A pharmaceutical material comprising a crystalline form of the compound of formula (V):



or a pharmaceutically acceptable salt thereof;

> wherein the pharmaceutical material comprises the compound of formula (V), or a pharmaceutically acceptable salt thereof, in an amount greater than 99.0% by weight based on the total weight of the pharmaceutical material, the pharmaceutical material comprises 0.0001 % to less than or equal to 0.15% of a compound of formula (VI):



and the crystalline form of the compound of formula (V) exhibits an X-ray powder diffraction pattern comprising peaks at the following diffraction angles (28): $10.3\pm0.2$, $10.4\pm0.2$, $17.9\pm0.2$, $18.8\pm0.2$, $19.5\pm0.2$, and $20.7\pm0.2$.

Claim 1 of the '714 Patent recites a "pharmaceutical formulation comprising" a "pharmaceutical material" with analogous characteristics, in addition to "a pharmaceutically acceptable excipient."  Claim 1 of the '584 Patent recites "a method of lowering low-density lipoprotein cholesterol (LDL-C) in a human in need thereof comprising administering to the human a therapeutically effective amount of

a pharmaceutical material" with similar characteristics.  Claim 1 of the '087 Patent recites a "pharmaceutical material comprising a compound of formula (V)" and "compris[ing] 0.001% to 0.15% of a compound of formula (VI)."  Claim 1 of the '227 Patent recites a "pharmaceutical material comprising a crystalline form of the compound of formula (V)" and further comprising 0.0001% to 0.15% of a compound of formula (VIII).

During prosecution of the '714 Patent, the Examiner rejected the claims, contending that the prior art already taught a high purity form of bempedoic acid. *See* Ex. 7 ('714 Patent File History, Mar. 30, 2023 Non-Final Rejection) at 10.  In response, named inventor Richard Copp submitted a declaration describing Esperion's efforts to develop "an acceptable active pharmaceutical ingredient" and distinguishing the claimed pharmaceutical material that he and the other inventors discovered from the forms of bempedoic acid generated using prior art small-scale processes.  Ex. 13 (Copp Decl.) at ¶ 8, 14-23.  In that context, Dr. Copp explained that the compositions generated in the prior art did not include the same "diol" impurity recited in the claims.  *Id*. at ¶¶ 14-23.

In contrast to the Asserted Patents, which relate to compositions and methods of treatment using such compositions, Esperion separately filed other related patents applications based on the same specification that specifically claimed processes for manufacturing bempedoic acid at a commercial scale.  Those process patent

applications issued as U.S. Patent No. 11,987,548 and U.S. Patent No. 11,407,705, which are not asserted in this case.  The claims of those patents expressly include the specific process steps that Defendants propose reading into the words "pharmaceutical material."

## III.    RELEVANT LEGAL PRINCIPLES

Claim construction is a question of law.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).  The words of a claim are given their ordinary and customary meaning as they would be understood by a person of ordinary skill in the art at the time of the invention.  *Phillips*, 415 F.3d at 1315-17.  In construing a claim, the court relies primarily on intrinsic evidence.  *Id.* at 1315-17.  In order of significance, intrinsic evidence includes (1) the claim language itself, (2) the specification, and (3) the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Courts look first at the claim language itself to define the scope of the invention.  *Id*.  Claims themselves provide substantial guidance as to the meaning of terms.  *Id.*  Both "the context in which a term is used in the asserted claim" and "other claims of the patent in question" are "highly instructive." *Phillips*, 415 F.3d at 1314.  Courts then turn to the specification, which is highly relevant to the claim construction analysis.  *Vitronics*, 90 F.3d at 1582.  The specification is often "the single best guide to the meaning of a disputed term."  *See Phillips*, 415 F.3d at 1315.

The specification is the primary basis for construing claims and courts have consistently reaffirmed the importance of the specification for claim construction. *See id.* After considering the claims and the specifications, courts then look to the prosecution history of a patent, which is relevant to show how the PTO and the inventor understood the invention. *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582–83). While less significant than intrinsic evidence, extrinsic evidence can also be useful in determining the meaning of terminology as a skilled artisan would understand it. *See Phillips*, 415 F.3d at 1317-18.

A party seeking to import limitations from a specification or otherwise narrow claim scope must meet an "exacting" standard to show such a construction is warranted. *Thorner v. Sony Comput. Ent't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). To meet this high standard for disavowing claim scope, the specification or prosecution history must include "clear and unmistakable" language to suggest the claims are not entitled to their full scope. *Continental Circuits*, 915 F.3d at 798.

## IV.    LEVEL OF SKILL IN THE ART

While the level of skill in the art is unlikely to be contested or dispositive of the claim construction dispute at issue here, a person of ordinary skill in the art of the Asserted Patents would have graduate-level training in chemistry, chemical engineering, or a related discipline with some years of industry experience in developing commercial-scale pharmaceutical drug products for regulatory approval.

11

## V.    CONSTRUCTION OF DISPUTED PATENT TERMS

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "pharmaceutical material" ('511 Patent Claims 1-17, '714 Patent Claims 1-20, '584 Patent Claims 1-20, '087 Patent Claims 1-17, '227 Patent Claims 1-20) | Plain and ordinary meaning in view of the claims, specification, and prosecution history, which is:<br><br>A substance suitable for use as an active pharmaceutical ingredient | A composition of matter made by a process comprising the steps of:<br><br>(a) contacting ethyl isobytyrate with a substituted 5-chloropentane in the presence of a first base to form a compound of formula (I):<br><br>Cl⌒⌒⌒CO$_2$Et, (I)<br><br>wherein the substituted 5-chloropentane is selected from the group consisting of 1-bromo-5-chloropentane and 1-iodo-5-chloropentane;<br><br>(b) contacting the compound of formula (I) with a salt of formula $[M]^+[X]^-$ to form a compound of formula (II):<br><br>X⌒⌒⌒CO$_2$Et, (II)<br><br>wherein $[M]^+$ is selected from the group consisting of Li$^+$, Na$^+$, and K$^+$, wherein $[X]^-$ is selected from the group consisting of Br$^-$ and I$^-$;<br><br>(c) contacting the compound of formula (II) with toluenesulfonyl methyl isocyanide in the presence of a second base to form a first intermediate, and contacting the first intermediate with an acid to form a compound of formula (IV): |

12

| | | |
|---|---|---|
| | |  (IV)<br><br>(d) contacting the compound of formula (IV) with a reducing agent to form a second intermediate; and<br><br>(e) contacting the second intermediate with a hydrolyzing base to form a compound of formula (V):<br><br> (V)<br>; and<br><br>(f) purifying the compound of formula (V) |

## A. The Plain Meaning of "Pharmaceutical Material" in the Asserted Patents Is "a Substance Suitable for Use as an Active Pharmaceutical Ingredient."

The term "pharmaceutical material," which appears in each independent claim of the asserted patents, is used throughout the patent in its ordinary, commonly understood sense in the field. Although the term appears nearly 200 times in each Asserted Patent, the specification does not include an express definition of the term because there is no need to do so. Its usage in the Asserted Patents does not depart from its plain and common-sense meaning as a material[3] (*i.e.*, an ingredient or

---

[3] *See* Ex. 10 (Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients Guidance for Industry) at 49 (Glossary) (defining "Material" as "a general term used to denote raw materials (starting materials, reagents, solvents),

substance) that can be used in pharmaceutical products, including drugs for the treatment of medical conditions.  In the context of patents that concern development of a chemical compound—bempedoic acid—to exploit its potential therapeutic activity, the "pharmaceutical material" at issue is not just any ingredient that can be used in a drug product, but a substance suitable for use as an *active pharmaceutical ingredient*.[4]  Hence, the "summary" of the Asserted Patents describes the inventors' discovery of "highly pure, stable forms of bempedoic acid *suitable for use as an active pharmaceutical ingredient*."  Ex. 1 ('714 Patent) at 1:32-35 (emphasis added).

    This construction of "pharmaceutical material" as a "substance suitable for use as an active pharmaceutical ingredient" is consistent with the surrounding language of the asserted claims.  *First*, the asserted claims set forth structural requirements of the "pharmaceutical material" that comport with its function as an active pharmaceutical ingredient: (1) the material must contain the bempedoic acid compound (*i.e.*, the compound of formula V) in a stable "crystalline" form that facilitates formulation into tablets and other solid oral dosage forms; (2) the material must also be highly pure, containing a high percentage of bempedoic acid by weight;

---

process aids, intermediates, APIs [active pharmaceutical ingredients], and packaging and label materials").

[4] *See id.* at 48 (Glossary) (defining "active pharmaceutical ingredient" as a "substance or mixture of substances intended to be used in the manufacture of a drug (medicinal) product and that, when used in the production of a drug, becomes an active ingredient of the drug product.").

and (3) the material must also contain low, controlled levels (between 0.0001% and 0.15% by weight) of a specific diol impurity (*i.e.*, the compound of Formula VI) and/or a specific acetate impurity (*i.e.*, the compound of Formula VIII).[5]  *See, e.g.*, Ex. 3 ('511 Patent) at 81:50-56 ("wherein the pharmaceutical material comprises the compound of formula (V) . . . the pharmaceutical material comprises 0.0001% to less than or equal to 0.15% of a compound of formula (VI)"); *see also* Ex. 4 ('584 Patent) at 83:52-58 (same); *see also* Ex. 1 ('714 Patent) at 83:18-24 (same); *see also* Ex. 5 ('087 Patent) at 83:12-16 (same); *see also* Ex. 6 ('227 Patent) at 84:35-41 ("wherein the pharmaceutical material comprises the compound of formula (V) . . . and the pharmaceutical material comprises 0.0001% to 0.15% of a compound of formula (VIII)"); Ex. 3 ('511 Patent) at 82:5-9 (identifying an X-ray diffraction pattern for the compound of formula (V)); Ex. 4 ('584 Patent) at 84:21-25 (reciting a high percentage of purity for the compound of formula (V)); Ex. 1 ('714 Patent) at 84:9-11 (claiming the level of unknown impurities in the pharmaceutical material). Notably, the maximum 0.15% by weight threshold permitted by the claims is the

---

[5] Indeed, the specification identifies multiple impurities, representing several different embodiments of the invention, but the claims of the asserted patents identify only the diol impurity (formula (VI)) and the acetate impurity (formula (VIII)), confirming that the scope of the invention is defined by the specific structure recited in the claims.  *See* Ex. 1 ('714 Patent) at Section IV of the Detailed Description of the Invention, "High Purity Compositions of Bempedoic Acid," 50:39 *et. seq*.

15

maximum impurity threshold permitted by regulatory bodies for impurities in an API. *See, e.g.*, Ex. 11 (Guidance for Industry Q3A Impurities in New Drug Substances) at 11. *Second*, the claims make clear that the "pharmaceutical material" is the active ingredient of a "pharmaceutical formulation" that also includes an inactive ingredient, or "pharmaceutically acceptable excipient." *See, e.g.*, Ex. 1 ('714 Patent), Claim 1, at 83:6-46 (reciting a "pharmaceutical formulation" "comprising . . . a pharmaceutical material . . . and a pharmaceutically acceptable excipient."); *see also* Ex. 5 ('087 Patent), Claim 11, at 84:56-85:17 (same).

Esperion's construction is also consistent with the use of "pharmaceutical material" throughout the specification and prosecution histories of the Asserted Patents. During prosecution of the '511 Patent, Esperion pointed to the Section IV of the Detailed Description of the Invention, titled "High Purity Compositions of Bempedoic Acid" (Ex. 3 ('511 Patent) at 50:19 *et. seq.*), as written description support for the claimed "pharmaceutical material." *See* Ex. 12 ('511 Patent File History, Oct. 6, 2022 Applicant Remarks) at 7-8. This portion of the specification describes the properties of the pharmaceutical material recited in the claims that render the substance suitable for use as an active pharmaceutical ingredient, including a crystalline form of bempedoic acid, high purity by weight of the compound, and controlled amounts of impurities. Ex. 3 ('511 Patent) at 50:19-57:49.

16

Similarly, during prosecution of the '714 patent, named inventor Dr. Copp emphasized in his declaration that the claims are directed to a material suitable for use as an API. *See* Ex. 13 (Copp Decl.). Specifically, Dr. Copp explained that the inventors' goal was to "produce an acceptable active pharmaceutical ingredient (API)" for bempedoic acid that could be made at commercial scale and elaborated on the challenges of meeting the 0.15% by weight limit on known impurities found in APIs. *Id*. at ¶ 8. Accordingly, at the end of Example 1 of the specification, the patents explain that the "pharmaceutical material" prepared in the example "was treated as the final Active Pharmaceutical Material (API)," but only if it met the requisite "the impurity profile criterion." Ex. 1 ('714 Patent) at 69:20-22, 70:36-38. Thus, the specification and prosecution history make clear that the claimed "pharmaceutical material" is defined by physical characteristics (including its content, crystalline form, purity, and controlled impurities) that make it suitable for use as an API.

In short, the ordinary usage of "pharmaceutical material" in the context of the claims, specification, and prosecution history, make clear that the term means "a substance suitable for use as an active pharmaceutical ingredient." This should be the end of the claim construction analysis. The Court need not go further to construe the term.

**B.    There is No Basis for Importing Process Limitations into the Claim Term.**

17

Against the plain meaning of the claim term, Defendants propound a construction of "pharmaceutical material" that would convert the asserted composition claims into product-by-process claims that silently incorporate 170 words describing six process steps from the specification. That construction fails under well-established case law. *See Thorner*, 669 F.3d 1362, 1366 ("We do not read limitations from the specifications into claims; we do not redefine words."). Defendants cannot credibly contend that the words "pharmaceutical" and "material," either separately or together, ordinarily connote any process steps, much less the specific ones Defendants propose. Nor can Defendants meet the high bar of establishing an unequivocal disclaimer that would justify importing process limitations from the specification into the claim term.

### 1. *The claims do not contain process steps.*

The words of claims define their scope in the first instance. *See Vitronics*, 90 F.3d at 1582. Here, the plain language of the asserted claims does not include any process limitations. *See* Ex. 3 ('511 Patent) at 81:29-84:66; *see also* Ex. 4 ('584 Patent) at 83:37-86:61; Ex. 1 ('714 Patent) at 83:5-85:49; Ex. 5 ('087 Patent) at 83:2-86:24; Ex. 6 ('227 Patent) at 83:40-86:61. The verbs "contacting" and "purifying," which define the key acts in Defendants' proposed process limitations, appear nowhere in the claims. And nothing in the words "pharmaceutical" and "material," or in the phrase "pharmaceutical material," connotes any of these specific

18

manufacturing steps. *See, e.g.*, *Vifor (Int'l) AG v. Mylan Laby's Ltd.*, No. 19-13955, 2021 WL 2652123, at *6 (D.N.J. Jun. 28, 2021) ("[C]ourts are typically reluctant to read into claims particular methods of manufacture where no such process limitations appear in the claims.").

Rather, as discussed, *supra* Section II.B, each claim is expressly directed to the structural components of an active pharmaceutical ingredient, including its physical form, content, and purity. Courts, including this one, have consistently disfavored construing structural claim language to require the performance of process steps. *See, e.g.*, *Incyte Corp. v. Sun Pharm. Indus. Ltd.*, No. 24-6944, D.I. 135, at 9-15 (D.N.J. Nov. 1, 2024) (Neals, J.). Indeed, even when a claim term can be readily construed to "connote with equal force a structural characteristic of the product or a process of manufacture," which is not the case here, courts favor the structural reading. *Id*. at 12 (quoting *In re Nordt Dev. Co., LLC*, 881 F.3d 1371, 1375 (Fed. Cir. 2018)).

The absence of process steps in the claims of the Asserted Patents is telling when contrasted with the claims of two other patents in the same family that expressly claim the process steps in Defendants' proposed construction. *Compare* Ex. 3 ('511 Patent) at 81:29-84:66 ("A pharmaceutical material comprising a crystalline form of the compound of formula (V) . . .") *and* Ex. 4 ('584 Patent) at 83:37-86:61 ("A method of lowering low-density lipoprotein cholesterol (LDL-C) .

19

. . comprising administering . . . a therapeutically effective amount of a pharmaceutical material . . .") *and* Ex. 1 ('714 Patent) at 83:5-85:49 ("A pharmaceutical formulation comprising: a pharmaceutical material comprising a crystalline form of the compound of formula (V) . . .") *with* Ex. 8 ('548 Patent) at 83:1-86:55 ("A method of preparing a pharmaceutical material comprising a compound of formula (V) . . .") *and* Ex. 9 ('705 Patent) at 82:28-86:38 ("A method of preparing a compound of formula (V) . . ."). None of this language appears in the claims of the asserted patents. The process claims of the '548 and '705 patents make clear that when the inventors wanted to define their invention by a particular process, they clearly knew how to do it and did so expressly. Indeed, what is abundantly evident is that the inventors elected to claim their novel manufacturing process by its steps in the '548 and '705 patents, while claiming the novel forms of bempedoic acid by its composition and properties in the Asserted Patents.

Additionally, because the term "pharmaceutical material" also appears in the '548 and '705 Patents, the term should be construed to possess the same meaning across patents within the family. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). It would be incongruent to read a process limitation into the term "pharmaceutical material" in the Asserted Patents because it would render the

process steps expressly recited in the '548 and '705 Patent claims superfluous. For example, Claim 1 of the '548 Patent recites "a method of preparing a pharmaceutical material comprising a compound of formula (V), the method comprising" four steps for preparing bempedoic acid. Ex. 8 ('548 Patent) at 83:1-67. If Defendants' proposed construction were substituted for "pharmaceutical material," the claim would read "a method of preparing a composition of matter made by a process comprising the steps of [steps a-e] comprising a compound of formula (V), the method comprising [steps a-d] . . ." This would violate basic principles of claim construction. *See, e.g.*, *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (rejecting a claim construction that "renders other parts of the claim superfluous" "claim construction that would render additional, or different, language in another independent claim superfluous."). For these reasons alone, Defendants' proposed construction flies in the face of basic principles of claim construction and should be rejected.

### 2. *Importing process limitations into claims is highly disfavored and unjustified here*

When a limitation is nowhere to be found in the claim language, the Federal Circuit's caselaw has made clear that importation of those limitations into the claims is highly disfavored and limited to extremely narrow circumstances. In particular, because it adheres to the general rule that product claims are not limited to the processes used to make the product, the Federal Circuit imposes an exacting standard

for importing process limitations into product claims.  *Continental Circuits*, 915 F.3d at 795-99 (finding that "absent 'clear and unmistakable' language suggesting otherwise," statements in the specification could "not meet the 'exacting' standard required to limit the claims" to a particular process); *Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, 345 F. App'x 594, 597 (Fed. Cir. 2009) ("We have repeatedly warned of 'the danger of reading limitations from the specification into the claim.'").

The Federal Circuit has rejected attempts by parties to import process limitations into claims that recite no process steps on numerous occasions, and the Court should do so here as well.  "[A] novel product that meets the criteria of patentability is not limited to the process by which it was made." *Vanguard Products Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000).  The mere fact that a method of manufacture is "cited as advantageous, does not itself convert product claims into claims limited to a particular process." *Id.*; *see also Continental Circuits*, 915 F.3d at 797; *c.f. Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1372 (Fed. Cir. 2007) (adopting limitations from the specification when it "uses language of requirement, not preference").  In particular, language indicating that a process is "illustrative" and "representative" signals that the process is not a requirement of the invention and should not be imported as a claim limitation. *Sanofi-Aventis*, 345 F. App'x. at 596-98.

Here, the language in the shared specification of the Asserted Patents relating to exemplary processes is plainly permissive. For example, the specification describes the methods of preparing bempedoic acid as "one aspect" of the invention. Ex. 1 ('714 Patent) at 21:50-57. The specification likewise points to pharmaceutical materials comprising bempedoic acid as another aspect of the invention. *See id.* at 50:39-42. Moreover, the specification states "[i]n certain embodiments, the methods of preparing bempedoic acid result in purified bempedoic acid," and provides that "*in various embodiments*, the methods [for preparing a pharmaceutical material comprising bempedoic acid] generally include" process steps. *Id.* at 22:2-, 22:24-23:3 (emphasis added). The specification describes the process for preparing bempedoic acid as part of "certain embodiments" that "generally include" and "can" be used to create the pharmaceutical material of the claims. *Id.* at 22:2-23. Nowhere does the specification state that any specific process is a *requirement* of the claimed inventive compositions.

Further, the specification specifically states that the "synthetic and analytical protocols described in this application are offered to illustrate the compounds, pharmaceutical compositions, and methods provided herein and are not to be construed in any way as limiting their scope," making Defendants attempt to so limit the claims improper. *Id.* at 64:46-51. The specification also makes clear that none of its language should be read to limit the scope of the claims. *See id.* at 6:13-19,

6:45-51 ("No language in the specification should be construed as indicating any non-claimed element as essential to the practice of the invention."). In similar cases, courts have declined to import process limitations into composition claims. *Merck Sharp & Dohme Corp., v. Xellia Pharmaceuticals Aps*, No. 14–199, 2015 WL 82386, at *4 (D. Del. Jan. 6, 2015) (refusing to read in process limitations based on examples in the specification). Defendants' attempts to read a specific, detailed process into the term "pharmaceutical material" is belied by expressly permissive language in the patent specification.

The prosecution histories of the Asserted Patents also fail to provide support for Defendants' proposed claim construction. Defendants look to the Copp Declaration for support, but the Copp Declaration references prior art processes to show why a POSA would not have expected the diol impurity to be present in prior art preparations of bempedoic acid. It did not purport to define the scope of the claims or the term "pharmaceutical material," which was not the subject of the statement. *See* Ex. 13 (Copp Decl.) at ¶¶ 6-23. Courts have repeatedly held that such an explanation of why the prior art does not contain the structural features of the claimed invention is not a basis for reading process limitations into the claims. *See, e.g.*, *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1039 (Fed. Cir. 2020) (refusing to read in a process limitation where a statement merely sought to show how claimed particles were different from the prior art, which could not

24

possibly have produced the particles as claimed); *see also Sanofi-Aventis*, 345 F. App'x at 597 (finding that examples in the specification comparing the prior art process with the described HPLC process did not warrant reading the HPLC process into composition claims).

Furthermore, Esperion's use of the term "fingerprint impurity" in a response to an office action does not show that Defendants' process limitation must be read into the meaning of the term "pharmaceutical material." Doing so amounts to cherry-picking a single statement from the prosecution while completely divorcing it from the full context of the prosecution history. *See Mass. Inst. Of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1120 (Fed. Cir. 2016) ("[I]t is important to consider the statements made by the applicant both in the context of the entire prosecution history and the then-pending claims."). The context of the prosecution history shows that the reference to a "fingerprint impurity" in one response was merely "indicative" of the bempedoic acid of the invention. Ex. 2 ('714 Patent File History, April 12 2023 Applicant Remarks) at 6-7. It did not claim that the specific process the inventors described, and that Defendants now seek to read into the claims, was the *only* way to create a pharmaceutical material that has a high purity and includes the claimed impurities at a controlled level. *Id*.; *see, e.g.*, *Sanofi-Aventis*, 345 F. App'x at 598 (refusing to read in a process limitation where the intrinsic evidence never asserted that the process was required to obtain the claimed product). Even if that

25

was not clear enough in those statements, Esperion explicitly stated multiple times that they were claiming only a physical end product. Ex. 2 ('714 Patent File History, April 12, 2023 Applicant Remarks ) at 6 ("[Esperion] is claiming a pharmaceutical composition"), at 7 ("[Esperion's] claimed invention is a pharmaceutical material"). Esperion was also unequivocal that although their statements "include[] reference to the methods of making bempedoic acid," the difference between the claimed compositions and the prior art were "the resulting compositions of matter and their impurity profiles." *Id*. at 7. Thus, the prosecution history, including the single statement upon which Defendants rely, provides no reason to depart from the plain and ordinary meaning of the term "pharmaceutical material." Defendants simply cannot meet their burden of showing that Esperion clearly and unequivocally disclaimed the full scope of "pharmaceutical material" to require that a specific, detailed process should be read into the claims.

Defendants' proposed construction should be rejected.

## VI.   CONCLUSION

For these reasons, the Court should adopt the plain meaning of "pharmaceutical material" as "a substance suitable for use as an active pharmaceutical ingredient" and reject Defendants' proposal to import process limitations into the claims.

26

Dated:  January 23, 2026

Respectfully submitted,

By:*s/Liza M. Walsh*
Liza M. Walsh
Katelyn O'Reilly
Jessica K. Formichella
WALSH PIZZI O'REILLY
FALANGA LLP
Three Gateway Center,
100 Mulberry Street, 15th Floor
Newark, NJ 07102
(973)757-1100

OF COUNSEL:

Nicholas K. Mitrokostas
Michael Wiper
WHITE & CASE LLP
75 State Street
Boston, MA 02109
(617) 979-9300

Elizabeth J. Holland
Becky Steephenson
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 1002
(212) 819-8200

Jenny J. Zhang
Michelle Bone
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, D.C. 20005
(202) 626-3600

*Attorneys for Plaintiff Esperion Therapeutics, Inc.*